## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **EVA M. SEVICK** | § | |
| **Plaintiff** | § | **CIVIL ACTION NUMBER** |
| | § | |
| **VS.** | § | **4:16-cv-2803** |
| | § | |
| **UNIVERSITY OF TEXAS HEALTH** | § | |
| **SCIENCE CENTER AT HOUSTON** | § | |
| **Defendant** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Eva M. Sevick, Plaintiff herein, by and through her attorney of record and files this her *Plaintiff's Original Complaint*, and in support thereof would show:

### I.
### Jurisdiction and Venue

1.  Eva M. Sevick (Sevick) brings this cause of action pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §2000e *et seq.*), the Americans with Disabilities Act of 1990 as amended (42 U.S.C. §12101 *et seq.)* and 42 U.S.C. §1981a.

2.  The jurisdiction of the Court over this controversy is invoked pursuant to the provisions of 28 U.S.C. §1331, §1343(a)(3)(4), 42 U.S.C. §2000e-5(f)(3) and §12117(a).  As the unlawful employment practices complained of herein occurred within the Southern District of Texas, Houston Division and Sevick resides in this district, venue is proper in this district pursuant to 42 U.S.C. §2000e-5(f)(3), 42 U.S.C. §12117(a) and 28 U. S. C. §1391(b)(2).

1

3.  Injunctive and declaratory relief, damages and other appropriate legal and equitable relief are sought pursuant to 42 U.S.C. §2000e-5(f)(g) and 42 U.S.C. §12117(a) and 42 U.S.C. §1981a.

4.    Sevick, a resident of Montgomery, in Montgomery County, Texas, filed a charge of discrimination against the University of Texas Health Science Center at Houston (UTHSC-H) on April 22, 2013.   She amended her filing due to continued discrimination and retaliation; those amendments were filed on October 15, 2013, September 29, 2014 and February 18, 2014.   In her filings with the Equal Employment Opportunity Commission, Sevick alleged discrimination based on her gender (female) and being regarded as disabled which resulted in her being referred by UTHSC-H for a fitness for duty exam.   She also alleged in her EEOC filings a continuing hostile work environment due to discrimination and retaliation.

5.  The United States Department of Justice, Civil Rights Division issued the Notice of Right to Sue on June 14, 2016 and Sevick received the Notice on June 21, 2016.  Sevick has timely and fully complied with all prerequisites to jurisdiction in this Court.

## II.
## Parties

6.  Sevick is a person/employee entitled to protection pursuant to the provisions of Title VII (42 U.S.C. §2000e(f)) and the ADAAA (42 U.S.C. §12111(4)).

7.  UTHSC-H is an employer as defined under Title VII (42 U.S. C. §2000e(b)) and the ADAAA (42 U.S.C. §12111(5)).

8.  UTHSC-H is an institution of higher education located in Houston, Harris County, Texas.

9.  UTHSC-H employs more than 500 employees. (42 U.S.C. §1981a(b)(3)(D))

### III.
### Facts

10.  Sevick is a professor of Molecular Medicine at the Brown Foundation Institute of Molecular Medicine for the Prevention of Human Diseases (IMM), Center for Molecular Imaging (CMI), at UTHSC-H.  She has been employed with UTHSC-H since 2008.

11.  Sevick complained about gender discrimination in an internal complaint with UTHSC-H in 2009.  As a result of that complaint, UTHSC-H has retaliated against her.  The discriminatory and retaliatory acts have been ongoing.

12.  In Spring 2012, Sevick's administrative assistant, Jessica Nollkamper, advised Sevick the Director of Management Operations of IMM, Steve Selby,  informed the assistant Sevick's molecular imaging operations were being taken over.  Dr. John Hancock, Director of the IMM, advised Sevick he was unaware of any transfer.

13.  Nollkamper also told Sevick Selby told Nollkamper to file a complaint of hostile work environment against Sevick, although Nollkamper had no such complaint to make; Selby was trying to incite Nollkamper against Sevick.

14.  Selby also assigned charges to the CMI budget which were not incurred by CMI; this resulted in less funds available to the CMI program.  Hancock and Selby attempted to remove the Flow Cytometry Core (of which Sevick was a Principal Investigator of the CPIT grant that supported the Core) and the Tissue Histopathology Core, both of which she created to serve all faculty members in the IMM.  Hancock and Selby required that these service centers, which supported all faculty in the IMM, be funded by only Sevick's start-up and chair funds because Hancock and Selby stated these Cores were in deficit; they were incorrect.  Sevick later discovered other IMM Cores were in

far greater deficit but those deficits were covered by Hancock.  The deficit alleged in Sevick's Cores was created to abscond her start-up and chair funds, making her unable to manage her Cores efficiently, which led to the Cores becoming less performing over time.

15.  Salary support of up to 95% was to be funded by research grants obtained by Sevick for CMI. Any amount in excess of 50% was to be returned to Sevick's CMI account with half of the amount available for unrestricted use.   That did not occur.  Sevick requested the funds and was denied.

16.  Because unauthorized charges were made to Sevick's CMI accounts, her start-up and chair funds were depleted without her authorization.  Start up funds remained available within the IMM for hiring new faculty but not in Sevick's Center.  Funding support was provided to the other Centers in the IMM, but not the CMI which Sevick runs.  The other Centers have male directors; Sevick is female.

17.  In Spring 2012, Dr. David Gorenstein (Associate Dean for Research, Deputy Director IMM) was reportedly going through Sevick's locked offices after hours.  She reported the incident to Karen Parsons (Assistant Vice President and Chief Compliance Officer) who was also suppose to investigate Sevick's discrimination complaints; Parsons encouraged Sevick to file a complaint about Gorenstein's actions.  Sevick was reluctant and advised Parsons nothing good would come out of complaining because when she complained previously, her situation at UTHSC-H became worse. However, Sevick could not accept the discrimination, so she complained.  Sevick's successful service centers (all run by females) and the CPRIT grant support to run them were all taken over and provided to Gorenstein.  So her premonition was correct–things became worse and she was retaliated against.  In the end, the service centers were threatened to be given to Gorenstein and removed from Sevick's management–evidencing the continuation and escalation of discrimination.   She

complained bitterly externally and contacted CPRIT to file complaints.  Nonetheless, these service centers are now no longer under her control, as she was no longer able to manage them in the hostile environment that she still remains in at UTHSC-H.

18.  Sevick complained about lopsided treatment of service centers run by females as opposed to males at UTHSC-H—failure to support IDC bearing research of a female faculty member (while superlative and unrealistic support of private ventures of male faculty were afforded) and discrimination in salary metrics due to gender.  As a result of Sevick's complaints, further retaliation and discrimination against Sevick, her program and her staff occurred.

19.  Parsons was to investigate Sevick's complaints in Spring 2012.  An audit report was provided in September 2012; Parsons' report was provided January 2013, almost seven months after submitting the complaint.  Parsons insisted on personally reading her report to Sevick.  Parsons advised Sevick during this meeting that UTHSC-H could remove Sevick's grants from her if they desired.  Immediately after her presentation of the report to Sevick with the threat about removing the grants, Parsons presented a report to Hancock which resulted in Hancock placing Sevick on administrative leave just a few days later, January 22, 2013.  Sevick was required to undergo a fitness for duty exam in order to return to work and her research program at UTHSC-H.

20. UTHSC-H referred Sevick for a fitness for duty exam based on comments of its staff that Sevick had a "mental instability".  The first doctor evaluated Sevick based on the assertion of mental instability from UTHSC-H.  No accommodations of her "mental instability" were discussed with Sevick; she was referred for an exam.  She was referred based on her "behavior" during the meeting with Parsons.

21.  Sevick complained these actions were discriminatory and retaliatory.  Hancock did not follow

the UTHSC-H policy and procedure in referring Sevick for a fitness for duty evaluation. Hancock did not advise Sevick, nor request her response to Parsons' allegations, prior to the referral or even after the referral.

22.   Sevick attempted to schedule a doctor appointment as required by UTHSC-H and Monica Guidry (EAP at UTHSC-H) worked with Sevick to schedule the appointments but did not provide all the information necessary for the appointments; however, Guidry did approve of each doctor's appointment to provide the fitness for duty.

23.   As part of the referral process, the initial evaluating doctor was not provided with all the necessary information.   Guidry stated responses to various categories of information were required, but she did not supply those categories to him until after his initial report.   Guidry was aware of the identity of the initial evaluating doctor because Sevick asked for permission to see this doctor since she already had an appointment scheduled and the doctor was located near her residence.   Guidry approved the request and Sevick sought a fitness for duty exam as directed by UTHSC-H.

24.   The initial evaluating doctor was supplied some information from UTHSC-H which information described Sevick as a "constant complainer", as "lying" and having an "apparent mental instability". The initial evaluating doctor disagreed, finding no evidence of psychotic thinking, slips in logic, hallucinations or paranoia; he did find evidence of the effects of situational stress as occurs in individuals living or working in hostile or abusive environments.

25.   After supplying all the information, Hancock determined the fitness for duty conducted by the first doctor was not "satisfactory" and required Sevick submit to another.   Hancock did not advise Sevick what was not "satisfactory" about the first evaluation.   UTHSC-H also required Sevick undergo blood tests.

6

26. UTHSC-H forbid her conducting University business. Although she was denied the ability to conduct University business, her salary during the leave time was paid from grants; grants she was not working on due to the directive not to work on University business during enforced leave.

27. Because of the referral and placement on administrative leave, Sevick lost research time and opportunities for her very successful program. She was unable to conduct research or attend necessary conferences and meetings to obtain further research grants and programs. UTHSC-H terms these "just meetings", but in Sevick's world of research, meetings are important to gain support and funding for her research activities.

28. Specifically, Sevick lost opportunities to obtain and maintain funding for grants and to obtain new programs because she missed:

• meeting with patent lawyers in Houston
• NIH conference and meeting in San Francisco
• meeting in San Antonio, TX for potential U.S. Army contract
• Eli Lilly meeting to discuss autoimmune projects
• meeting with Drs. Zhang and Brown regarding DOD grant
• Site initiation for CPRIT funded clinical trial to insure FDA and IRB approved clinical study with Dr. Karni could start
• Meeting with UTHSC-H faculty, staff and TMC collaborators to prepare for the NIH P41 site visit
• Meeting to complete business with industry wishing to place new contracts with the CMI

29. Clinical trials were delayed compromising Sevick's ability to meet obligations of NIH funding. Sevick also was unable to meet with doctoral students and post-doc students to assist with their thesis progress. She could not certify the effort of her faculty and staff, so salary payments could be made from her grants, contracts and gift accounts. Selby routinely changed salaried effort distributions, so Sevick had to review, discuss and obtain input to accurately complete the effort certifications which are subject to penalties for fraud if they are not correct.

30. Sevick was found fit for duty by the second examining doctor also. However, additional terms of employment were created for her to maintain her position. Sevick was assigned a coach and meetings were to occur between Sevick, her coach and Hancock. Despite repeated requests by the coach, Hancock refused to schedule meetings with Sevick and the coach; all three did not meet together until October 2013.

31. Following Sevick's forced administrative leave, Hancock told Sevick to secure an account to fund her salary during the leave time period. She was forced to falsely certify expenditure of her effort on federal projects from January 22, 2013 through February 22, 2013. During this time period, she was not performing effort on behalf of any of her grants; she was not conducting University business and was told to remain away from campus.

32. In July 2012, Sevick had further funding problems for the CMI Center and expressed complaints to Dr. Giuseppe N. Colasurdo (President of UTHSC-H) and Dr. Nancy McNiel (Associate Dean for Administrative Affairs). The audit report received in September 2012 found that the balance of Sevick's start up account was missing $540,000 in June 2012. Selby still refused to provide balance sheets for the account, but he continued to claim the fund had a deficit.

33. In October 2012, CMI Faculty received pay raises, but Sevick did not. She questioned Hancock and reported to him her complaint about the crediting of accounts to other faculty while liabilities were placed on Sevick's accounts. Sevick complained the actions of finagling funds, budgets and finances occurred because of gender discrimination and retaliation.

34. In November 2012, UTHSC-H advised Sevick, that Jennifer Smith was investigating Sevick's complaints of discrimination. However, Smith left UTHSC-H at some point, without completing an investigation of Sevick's complaints, nor providing any status reports of her investigation.

35. In December 2012, Sevick complained about the distribution of funds for CMI.  Selby charged salaries to accounts and denied Nollkamper the ability to move salaries to appropriate accounts. Selby independently moved salaries to accounts placing those accounts in deficit.  Despite requests, Sevick did not receive itemized expenditure reports for her accounts.  If there was a deficit, Selby created it by the unauthorized charges he made to Sevick's accounts.  Selby provides other Center directors (males) itemized expenditure reports for their accounts.

36. In January 2013, Sevick discovered Selby stopped the service agreement on Sevick's PET/CT machine.  The system went down; Siemens would not service it and sponsored research could not be conducted.  Tumor bearing animals implanted three months prior and scheduled for imaging were needlessly wasted and had to be sacrificed to comply with animal regulations.  Salaries, supplies and animal lives were wasted.  Institutional Animal Care and Use Committee requirements forbid needless waste of animal life.

37.  A Texas Rat Snake was also found in a cage in the containment facility room that housed Sevick's and Gorenstein's animals.  The snake ate Sevick's very valuable research material, resulting in a required June 2012 report of non-compliance to the NIH and AAALAC.  This occurred after Sevick complained about discrimination and met with Parsons about her complaints. No snakes appeared prior to Sevick's report nor since.  Parsons did not investigate the compliance violation.

38. Sevick as the Principal Investigator on grants directed payments from her gift accounts in accordance with the donor's wishes but Selby paid persons at his discretion, ignoring Sevick's directives.  Selby stopped Sevick from conducting research that UTHSC-H obligated her to do. Sevick complained about these discriminatory and retaliatory acts also.

39.  RIFs occurred in the CMI in May 2013 although money was actually available to support the

personnel.

40.  Selby encouraged others to make complaints against Sevick.

41. Gorenstein was allowed to hire personnel in the same research area as Sevick although he had no funds for hiring; IMM paid Gorenstein's personnel's salaries.  Sevick had funds available, yet she was required to lay off personnel; the IMM did not subsidize , nor pay any of her personnel's salary.

42. Nollkamper claimed a hostile work environment, as suggested by Selby, and was removed from Sevick's supervision; Sevick was not provided alternative administrative support, but was required to continue to pay Nollkamper from Sevick's funds.

43.  Selby did not timely route Sevick's grant applications which threatened to prevent on-time submission to research sponsors.  This created a great deal of stress and anxiety for Sevick since timely submission of grant applications is critical.    Selby's manipulation of monies affected Sevick's ability to have a fully functioning research program.

44.  An internal discrimination complaint was filed against Sevick, promptly investigated by UTHSC-H, witnesses were contacted and then the complaint was dismissed.  Sevick's complaints were not promptly investigated, witnesses were not contacted and eight months elapsed before Parsons presented a report to Sevick that then resulted in a fitness for duty referral and administrative leave for Sevick.

45.  UTHSC-H not only did not investigate the Rat Snake issue, but also allowed an employee to retain access to UTHSC-H information after confirming that employee illegally sent Sevick's clinical research data and NIH grant-purchased supplies to an outside person who had no role in the research and was not covered by UTHSC-H's protocols to receive such data.  The confirmation of Sevick's complaint regarding this issue was not included in Parsons' report.  Sevick discovered in April 2012

this employee's UTHSC-H privileges were restored.  In August 2013, Sevick discovered the same persons involved in releasing information against UTHSC-H's protocols formed a company which sought to commercialize the technology developed by Sevick's NIH funded clinical trials to which the employee had access.

46.  Human Resources continued to instigate RIF's of Sevick's personnel without having accurate budget information.  Following a financial investigation, it was found Selby caused a deficit by not crediting $540,000 to Sevick's accounts.  Selby continued to withhold financial reports from Sevick, while providing them to her male center director colleagues.  Budget "mistakes" also continued resulting in termination of Sevick's staff despite the existence of budgetary monies to fund the positions in May 2013 but Hancock promised there would be no more RIFs.

47.  In June 2013, Hancock and Selby informed Sevick there would be five faculty and two more staff terminated.  Later Hancock agreed Selby's budget figures were in error, but not all of the RIF's were fully restored.

48.  In January 2013, during the Faculty Review process, all IMM faculty, except Sevick were invited to attend a meeting and provide comment on the faculty's performance in each faculty member's respective Center.  Only Sevick's faculty in the CMI were let go and not others from the IMM from Centers with far less dollars than Sevick's Center.  As result, she had no way to accomplish goals in her Center, because she had no faculty.  Other Centers do not suffer the same fate as Sevick's Center; their faculty are not terminated.  CMI faculty who were funded by peer-reviewed grants were sent termination letters, while no unfunded faculty were likewise sent termination letters.  Later, in 2014, CMI faculty who received "satisfactory" ratings by the IMM faculty peer-review procedure were terminated while unfunded faculty in other centers who received

"unsatisfactory" reviews were not terminated.

49.  An inequity in the allocation of resources exists for faculty who have no grants or contracts compared to faculty who receive funding.  Sevick is required to obtain funding, but then her funding is manipulated so that her staff are not funded and she cannot easily perform the research required in her Center.  The budgetary excuse does not truly exist; in addition, fiscal irresponsibility is excused for the male Center Directors.

50.  Hancock's actions of terminating the CMI staff (Sevick's Center) based upon erroneous budget deficits, but allowing the poor financial performance of the other male-directed Centers without taking appropriate measures, against those Centers, and their Directors and then going so far as to subsidize those Centers, indicates Hancock engages in gender discrimination and retaliation.  There is no legitimate reason for his actions.

51.  The additional hurdles Sevick must jump over to run her Center are not placed in the path of the other Center Directors who are male.  Sevick consistently maneuvers these hurdles and roadblocks to make her program successful.  The discrimination, retaliation, incompetence and unprofessionalism in the internal investigation, as experienced by Sevick, deter her from complaining about the additional items of discrimination she experiences on an almost daily basis. UTHSC-H's lack of response, except to ramp up its actions against her, distress Sevick because the only thing that ever happens are more actions against her.

## V.
### First Cause of Action
### Discrimination Based on Sex (Female)

52.  Sevick restates and hereby incorporates by reference any and all allegations of paragraphs 11 through 51  inclusive, herein, in support of her cause of action for discrimination pursuant to Title

VII.

53. Sevick alleges UTHSC-H intentionally discriminated against her in the terms and conditions of her employment based on her sex, female, in violation of Title VII.

54. Sevick is now suffering and will continue to suffer irreparable injury and monetary damages as a result of UTHSC-H's discriminatory practices unless and until the Court grants relief.

## V.
### Second Cause of Action
### Discrimination Based on Perceived Disability (Mental)

55. Sevick restates and hereby incorporates by reference any and all allegations of paragraphs 11 through 51 inclusive, herein, in support of her cause of action for discrimination pursuant the ADAAA.

56. Sevick alleges UTHSC-H  intentionally discriminated against her in the terms and conditions of her employment based on a perceived disability in violation of the ADAAA.

57. Sevick is now suffering and will continue to suffer irreparable injury and monetary damages as a result of UTHSC-H's discriminatory practices unless and until the Court grants relief.

## VI.
### Injunctive Relief

58. Sevick restates and hereby incorporates by reference any and all allegations of paragraphs 11 through 51, inclusive herein.  Sevick alleges UTHSC-H's discriminatory actions herein must be enjoined by this court in order to force UTHSC-H to comply with the law.

## VII.
### Attorney's Fees and Costs

59. Sevick seeks an award of reasonable and necessary attorney's fees and costs required to pursue

her claims of discriminatory conduct by UTHSC-H, pursuant to 42 U.S.C. §1988(b)(c) and 42 U.S.C. §2000e-5(k).

## VIII.
## Jury Trial Demand

60.  Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 42 U.S.C. §1981a(c) Sevick demands a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Sevick respectfully requests this Court enter a judgment:

a.      Declaring the acts and practices complained of herein are in violation of Title VII;

b.      Declaring the acts and practices complained of herein are in violation of the ADAAA;

c.      Enjoining and permanently restraining UTHSC-H from engaging in such unlawful employment practices and order such affirmative action as may be appropriate;

d.      Directing UTHSC-H to take such affirmative action as is necessary to ensure the effects of these unlawful employment practices are eliminated and do not continue to affect Sevick's employment opportunities;

e.      Directing UTHSC-H to place Sevick in the position she would have occupied but for UTHSC-H's discriminatory/retaliatory treatment of her and make her whole for all earnings she would have received but for UTHSC-H's discriminatory/retaliatory treatment of her, including, but not limited to wages, pension and other lost benefits and restoration and make-whole relief for the loss of any employment benefits and research income denied or lost by Sevick due to the discriminatory and retaliatory acts of UTHSC-H;

f.      Awarding Sevick compensatory damages pursuant to 42 U.S.C. §1981a;

g.      Awarding Sevick the costs of this action, including expert witness fees,  together with

reasonable attorneys' fees, as provided by 42 U.S.C. §1988(b)(c) and 42 U.S.C. §2000e-5(k);

h.      Awarding Sevick judgment for pre-judgment, and post-judgment, interest if applicable; and,

I.      Granting such other and further relief as this Court deems necessary and proper.

> Respectfully submitted,
> LAW OFFICES OF
> GAUL AND DUMONT
> 924 Camaron
> San Antonio TX 78212
> (210) 225-0685
> (210) 320-3445 - Fax
>
> By:    /s/ **Kala S. Dumont**
>        KALA S. DUMONT
>        kalasd@swbell.net
>        State Bar # 17902450
>        Attorney for Eva M. Sevick, Plaintiff